All right, the next case up is Millenium Holdings, number 18-3210. Morning, Your Honors. Morning. Thomas Redburn, Lowenstein Sandler for the Voya Lenders. I would respectfully request three minutes for rebuttal, please, Your Honor. That will be granted. Thank you. The bankruptcy court's entry of a final judgment extinguishing Voya's fraud claims through a compulsory release contained in a plan of reorganization was unconstitutional. Okay. We've got a lot to cover here, so let's jump right in. I kind of figured we did, Your Honor. You start by talking about 524E, though, and saying it's not statutorily authorized either, right? I mean, in your briefing, you made the pitch that the bankruptcy code itself doesn't authorize non-debt releases at all. That's correct, Your Honor. The fact that you're starting with the constitutional argument, is it fair to say that you think that that statutory argument is a weaker one? Not at all. Really? Would you concede that that's the minority position, that the majority of courts think that the code does authorize third-party releases? There is certainly a circuit split on the issue, and I'll answer the question in two respects. First, there's certainly a split among the circuits on the issue, and I think, yes, it's probably correct that the majority of circuits allow third-party releases, but it's not a clear majority. You've got at least the 5th, 9th, and 10th that have said 524E clearly bars non-consensual third-party releases. Can I back up just one second? Sure. I think of helping my high schooler out with math problems, sort of order of decision. Is there some reason why we can't consider the equitable mootness question first? I mean, it seems to me that deals with whether there's a case or controversy, and it does seem like it's a threshold issue, much like the constitutional issue. Plus, I think some jurisprudence might say if you don't have to get to a constitutional issue, you should probably not do it. So can we just decide this case on the basis of equitable mootness? No, not with respect to the Stern issue. The Stern issue has to be decided first because it goes to the very question of the constitutional power of the bankruptcy court to act. True, but if there's no case or controversy, isn't that a separate means to decide this case? But equitable mootness is not a case or controversy issue. Mootness isn't a case or controversy issue? Not equitable mootness. Equitable mootness is not Article III mootness. Article III mootness means that the court can't grant any effective relief at all. Equitable mootness means that the court chooses not to grant relief even though it could because it believes that that relief will do more harm, will cause more harm than good by unwinding the plant. So it's not two Article III requirements up against each other. Equitable mootness is purely a judge-made doctrine that has no constitutional foundation at all. So where you're faced with a situation where the claim that's been brought before the court is that the bankruptcy court did not act within its constitutional authority or exceeded its constitutional power, that question has to be decided first before the court can consider dismissing the case on equitable grants. Isn't it true that Justice Roberts wrote a very narrow opinion in Stern? If we take your position expanding Stern to include situations like this, it would, in essence, it brings us to where Chief Justice Roberts didn't want us to go with the distribution of work between the bankruptcy courts and the district courts. So the way I would answer that question, Your Honor, is that while Stern itself was a narrow holding, I mean, after all, the only thing that was issued in the case was a counterclaim that had been asserted by the debtor against the creditor, as both the Fifth Circuit in Frazen and now Justice Gorsuch in Renewable Energy when he was on the Tenth Circuit have both pointed out, while the holding was narrow, the reasoning that underlines the opinion is actually extremely broad. And as now Justice Gorsuch said himself in that, in the Renewable Energy opinion, the court said repeatedly that bankruptcy courts have no constitutional power to adjudicate claims that neither stem from the bankruptcy itself nor would necessarily be resolved as part of the claims allowance process. Are you suggesting that then Judge Gorsuch was expanding the scope of Stern? Not at all. I think he was construing. He was attempting to restate what Stern says, right? He was attempting to articulate the underlying principles in Stern and apply it to a context outside of Stern. And Stern says expressly and repeatedly that the question is whether the action being taken was integral to the restructuring of the debtor-creditor relationship, right? That is incorrect, Your Honor. It doesn't say that again and again and again? No, quite the contrary. What it says again and again and again is that the question is whether the claim would necessarily be resolved as part of the claims allowance process or stems from the bankruptcy itself. Now that language, the integral language, and I'll quote it to you from page 2617 of 131 Supreme Court Reporter. We explained, and he's talking about the lagging comp case that support the decision, that a preferential transfer can be heard in bankruptcy when the allegedly favored creditor has the claim because then the ensuing preference action becomes integral to the restructuring of the debtor-creditor relationship. In other words, it's the fact that something's become integral to the restructuring of the debtor-creditor relationship that makes it something that the bankruptcy court can look at. Isn't that that language? That language does appear, but this is the point, okay? What that language is referring to is the claims allowance process. And if you look. It says not just that it is explaining why the claims allowance process is something that is integral. It's not saying that the claims process is everything. It's saying the claims process becomes integral to the debtor-creditor relationship and that's why the bankruptcy court can get to it, isn't it? I would invert that actually. It's that the reason that it's integral to the debtor-creditor relationship, it's because it's part of the claims allowance process. And the claims allowance process, which has historically been within the core bankruptcy equitable power, is what actually grants the constitutional authority. And which is what. What an odd locution then to choose, Mr. Redburn, because then the words integral to the restructuring of the debtor-creditor relationship are meaningless. If all he had to say was claims processing, he could have been done with it. If the whole universe of stuff that's covered by the bankruptcies of the court's authority under the constitution is claims processing, all that needed to be said was it's not claims processing. We're done. But that isn't what happened. There was a careful walking through of things and a description of why claims processing is constitutional. It's because it's, quote, integral to the restructuring of the debtor-creditor relationship, right? And I would respectfully disagree with that, Your Honor, because the test that is actually formulated in Stern is it neither stems from the bankruptcy itself, nor the claim is necessarily resolved in the claims allowance process. The court does not go on to say. And if you have some other claim that would not necessarily be resolved as part of the claims allowance process, but is somehow otherwise integral to the debtor-creditor relationship with the bankruptcy court can adjudicate that too. The court didn't say that. Is that language irrelevant, integral to the restructuring of the debtor-creditor relationship? We should set that aside and forget it? I don't think it's irrelevant. It's descriptive. And it doesn't come from Stern itself. It comes actually from Langenkamp. And that's actually really key. Because what the court was doing, the Stern court was doing in that part of its opinion, was that it was tracing through the history of its Article III and its Seventh Amendment precedents in the context of bankruptcy. And all of those cases, Katchen, Langenkamp, Granfini and Sierra, Stern, they were all dealing with situations where claims had been asserted either by the debtors or by creditors. And the dividing line, what distinguishes the results in the four cases, is whether the claim that was being, as to which judgment was being entered, would have been necessarily resolved as part of the claims allowance process. What do we make of our own decision in In Re Global with the Silica injunction and the releases associated with it? I think that what In Re Global, first of all, it was a remand. I don't think the court actually endorsed the releases at all. But second of all, it's a channeling. You say we didn't endorse them. We said they were certainly possible, that you could do this. What was the purpose of remanding if what we were saying was, hey, take this back and do something unconstitutional? I don't think that the court, well, I don't think the constitutional issue had been raised before the court. So the court didn't consider it. With respect to the statutory issue, I don't think the court made a definitive decision on that issue one way or another, and didn't have to because they remanded for other reasons. We were remanded, just as we did in earlier cases, on the assumption that this was something that could be done, that based on Continental II, based on PWS, based on other cases, what, United Theaters, that this was something that, in fact, third-party releases are okay under certain limited circumstances. Continental lays out the factors that you've got to meet. If you meet them, you can have a third-party release. And we said that as an en banc court in In Re Global. How is it that in the face of that line of authority, you can say there's no basis for that here in the Third Circuit? So the way I would respond to that, Your Honor, is I think that, and I don't mean to sound flippant in any way, I think that when you look at those cases. That means we're going to get something flippant. When you look at those cases, start with Continental. What did Continental actually hold? What Continental actually held was that the release in that case violated 520-40. And the court, the panel went out of its way to say explicitly, we are not adopting a general rule as to when third-party releases would be permissible. We are not. Rules for when, what would make such releases okay, which would be purposeless if the court had thought they were categorically not okay. But the court didn't do that. The court explicitly said it was not doing that. It was not adopting a rule. And Judge Rendell went out of her way to say, we are not expressing an opinion as to the circumstances under which third-party releases would be acceptable. I'm having a hard time with that in light of PWS where it said, speaking of Continental, quote, we did not treat 520-40 as a per se rule barring any provision in a reorganization plan limiting the liability of third parties. But PWS involved a release that the court explicitly said didn't impact third-party liability. It's not like the releases at issue here. So even if PWS was interpreting Continental in that way, it still doesn't lead to the conclusion that there's statutory authority to do a third-party release along the lines that the bankruptcy court here did. You got me confused based on the same confusion, I guess, that the district court had. Because the argument you made in the district court was similar that, you know, those were tangential releases. But by their definition, if they're releases, they're releasing somebody from liability. That can hardly be tangential. Actually, the way PWS court articulated the scope of the release was that it didn't release them from liability. It determined what the governing legal standard of that liability was going to be. It's not the same thing. Here, the releases here extinguished the claims. So what are you asking us to do? You're asking us to come to a place where the releases were unconstitutional. We unwind this transaction. VOIA can pursue the fraud claims and just to recover under the plan. So may I? My time is expired now. May I answer Judge Ostroffel's question? So what we're asking to do is to reverse the district court, strike the releases from the plan as to VOIA, not undo the rest of the book. As unconstitutional? As unconstitutional or is not authorized by statute or, and I didn't even get to this point, even if you take the fairness and necessity of the reorganization standard that's incontinental, it's not fair because VOIA didn't actually receive consideration for the release. But what we're asking the court to do is to reverse, strike the release from the plan only as to VOIA. And yes, VOIA would be allowed to keep its portion of the consideration because... About 80%, right? Pardon me? About 80%. I think I paid about 88 cents on the dollar. Oh, no, it was more like 50 cents on the dollar. And actually, because VOIA as a non-consenting lender couldn't participate in one of the trusts, it was actually less than that. So it was nowhere near 80%. You're asking to keep what you got and bring this RICO coin? Correct. Correct. And there's nothing inequitable about that because, again, VOIA received that distribution in its capacity as a creditor. It didn't receive any consideration for the release. And when you're talking about equity, it makes no sense to penalize the innocent party when the whole reason we're here is because MLH and TA tried to ram through unlawful releases in a plan where they knew they had everybody over a barrel because the government was threatening to kill the company if it didn't have a settlement by December 30th. So are you acknowledging those are pretty extraordinary circumstances? I'm not sure I understand the question, your honor. Well, you just said the government had everybody. Everybody was over a barrel because the government was ready to pull the plug. And if they pulled the plug, that was it. It was game up. The company was dead. Correct. That's correct. I think that is what the record indicates. And that's not the mine run case, right? You don't usually have a case. Usually, if you're in a restructuring situation, you might have bad financial circumstances, but you don't have a circumstance where a government actor is saying, if I don't get my money by date X, this is all over. Your company is gone. But it's not an extraordinary circumstance that justifies the releases that were compelled here, particularly in the absence of consideration. Yeah, obviously, that's your position, but this is not the usual case, is it? I would concede that, your honor. It's not the usual case. I will, for a whole host of reasons, it's not the usual case. And had that happened, you would have received, not you, but Voya would have received nothing. Voya would have received whatever it would have received in a liquidation. And given that... Significantly less. It would have been significantly less. That is correct. It would have been significantly less. That is correct, but that also isn't the standard. Well, fairness is the standard, and 93% of the credit claims in the case thought this was fair because they voted for it and wanted it. Indeed, Voya, the collection of opt-out lenders under the name Voya for purposes of convenience, the only group that said we don't like it. Voya is the only group that voted against it. That is true. I'm not sure you can infer that the other 93% thought that it was fair. They made a different business decision. And look... I'm not saying if they thought it was unfair, they wouldn't have liked the business decision. Can we infer nothing from the fact that 93% of the credit claims thought it was a good deal? Nothing that's relevant... I'm sorry, I didn't mean to interrupt you, Honor. Nothing that's relevant to the issues that are before the court. And sure, people make business decisions all the time where they accept a bad deal even though they know it's unfair and they think it's bad. But they're accepting it because they either don't want to take risk or they want certainty. All right. Thank you, Counsel. Thank you, Honor. Thank you, Adversary. Thank you, Judge Chigares. And may it please the Court, John O'Quinn from Kirkland & Ellis. This is a classic case for equitable mootness. The District Court did not abuse its discretion in finding that what Voya seeks would be unfair and inequitable. And yes, you can decide this case on that basis. The central... How do you respond to your adversary's point that, no, we can't do that because this is a judge-made doctrine? Well, Judge Chigares, I agree that equitable mootness or prudential forbearance, as this Court has sometimes called it, is not the same as constitutional mootness. And so it doesn't have an Article III issue. It comes from courts recognizing, including this Court in the where it would be unfair, inequitable, and destroy the investment-backed expectations of third parties to grant the relief that's being sought. Now, the only argument... That doesn't get to the very pertinent legal question, Mr. O'Quinn, which is, do we have to decide the constitutional question first? Because if the Bankruptcy Court acted without any we'd just let it stand. So, Judge Jordan, two responses to that. So, first, the issue here is not a jurisdictional issue. And that is clear from this Court... We said it in In Re... What does this footnote, 32, mean in In Re Linear Electric? So, in In Re Linear Electric, this Court exercised its discretion not to treat an argument as having been waived. And the reason... That's true, but that's because we said it implicates the jurisdiction of the Bankruptcy Court and, therefore, our And, Judge Jordan, I think that that's because what the parties before the Court were saying. As Justice Scalia has recognized, there's often a conflation of the terms authority and jurisdiction. If you look, for example, at Judge Becker's opinion for this Court in core states, it addresses the distinction between jurisdiction and judicial power. And that's what you're talking about with respect to... What you're saying is that we just made a mistake when we said jurisdiction. I think that you were... in the colloquial sense, because that's how the parties were using it. Because, otherwise, it would be inconsistent with the Supreme Court's decision in wellness. Because wellness finds that the right to an Article III adjudicator is a personal right that is waivable. And that would not be true if it was a true, quote, jurisdictional issue in the Article III or the statutory jurisdiction sense of the term. So, I think there are one of three ways that you can decide this case. Just to get to where Judge Jordan and I are going here, I mean, you've started off with equitable mootness. Can this case be decided solely on that? Yes, I think the case can for two reasons. And we don't even have to get to the constitutional issue. And you don't even have to get to the constitutional issue. And the reason is because the constitutional issue is not a jurisdictional issue. It's no different than... You have to be making the case that Mr. Redburn and his clients waived any argument, assuming for the sake of that all we were saying in In Re Electric was by jurisdiction we meant a jurisdiction that's personal to the individual actor. You've got to be making the argument that they waived any arguments about jurisdiction. I actually don't, Judge Jordan. I mean, I think they did. And the Bankruptcy Court certainly found that at A325. But I'm not relying on that for these purposes. My point is that the right to an Article III adjudicator is no different than a Seventh Amendment right or a due process right. The District Court didn't think they'd waive those arguments. Well, the District Court said he specifically said he was not deciding the issue one way or the other. He raised questions. The language of the District Court was it appeared they preserved this argument. And he specifically made a decision that he was not deciding it one way or the other. He... Well, let's take it as a given that for purposes of our discussion, we don't think they waived it. They raised the jurisdictional argument. And it's in front of us. You think that in the face of that, we could still blow past it and get straight to equitable moves? Well, I do, Judge Jordan, for two reasons. One is it's not a, quote, jurisdictional argument as opposed to an authority argument, no different than a Seventh Amendment issue like the one that the Supreme Court had before it in Neese. And that's how the Supreme Court and Steele Co. distinguished the Neese case. Second is this issue, I think, has also been mooted in the traditional sense of the term by the District Court's own decision. The District Court, specifically at A376, said he was making an alternative holding. He also said this at A342, which he could do because he could treat the underlying decision as a report and recommendation. I can't answer this. Since the District Court repeatedly applies a clearly erroneous standard in reviewing the bankruptcy court, how could we say that the District Court actually performed the de novo review? So, Judge Jordan, I think that most of where the District Court is discussing clear error is in the context of its discussion about equitable mootness. And it's talking about facts. And it's talking about facts in the context of its... By definition, it's not a de novo review, is it? Well, the only... By definition, it's not a de novo review. I agree with that for purposes of his reliance on the facts that the bankruptcy court found for purposes of equitable mootness. All that I'm saying is that when you get to the point in his review of the releases, he only makes reference to clear error once. And that's on page 382. And I think his reliance there would be consistent with Rule 72A, where you can, in some cases, give reliance to... I'm just puzzled that we could... How would we write a decision that says, well, the District Court was applying clear error review, but it was effectively de novo review, so it's okay. I'm not sure how that... How does that write? Well, Judge Jordan, I think that it's often the case that the courts will say that they are doing two things at the same time. And I think that if you look at that in... Two mutually exclusive things? Well, I don't know that they are... You can't do both those things at the same time. That's one of those on-off switches. It's not a re-estat. You're either in the world of de novo or you're in the world of clear error. You can't be in both at the same time. Well, Judge Jordan, that gets back to answering the question that Judge Chigueras asked me a few minutes ago. How can you approach this? I think you can approach it in one of three ways, and to the extent that you disagree with any one of them, then they're the other two. One is to do what I said, which is that I don't think that you have a jurisdictional issue in front of you vis-a-vis Article III authority. I think that if it were jurisdictional, the Supreme Court's decision in wellness would be wrong, and that you can treat it just like due process. Two is that you can look at the district court, and third is you can do... Hold up for a second. I apologize, Judge Jordan. I mean, I know this is difficult for the advocates. You've got limited time, and we're taking you places other than where you maybe want to take your argument, but engage with me here. You've now said on a number of occasions that it's not really jurisdictional. It's not really bearing on subject matter jurisdiction. If that's true, what is the purpose of all of the discussion in Stern and Marathon and wellness of the distinction between Article III jurisdiction and Article I jurisdiction? If it's not true constitutionally significant jurisdiction? Well, respectfully, Judge Jordan, I don't think that those cases are referring to, quote, jurisdiction. I think they are referring to constitutional authority, and there's a well-known distinction between jurisdiction and authority. It's the distinction that was recognized by Judge Becker in core states. In core states, Judge Becker pointed out that bankruptcy courts don't have jurisdiction at all. It's all the jurisdiction of the district court. The question is whether or not you have authority by the decision maker. A magistrate judge doesn't have, quote, jurisdiction. The question is whether or not they have authority. That's what I'm talking about, and that's why I'm saying that it's ultimately not a jurisdictional issue at all. Okay. Assume we got past that, all right? Assume that, just for purposes of discussion, that we thought there was an argument that was preserved, wasn't waived, that it was of greater magnitude than the equitable concerns inherent in equitable mootness, and we thought we needed to deal with it. Answer your colleague's assertion that then-Judge Gorsuch in In Re Renewable Energy in saying, quote, whatever else he might say in the midst of this very much ongoing battle over bankruptcy and public rights, and you can say this much, cases properly in federal court but arising under state law and not necessarily resolvable in the claims allowance process trigger Article III's protections, unquote, which seems to focus very clearly on the claims allowance process. Yeah, I think there's a lot of discussion about the claims allowance process in Stern, and there's a reason for that, and that's because Stern is a specific application of Marathon. Marathon, of course, doesn't mention the claims allowance process at all. It doesn't rely on the claims allowance process, and if it did, then Marathon would have been an easier case, a simpler opinion, and would have imbued constitutional significance to the claims allowance process. What Stern was dealing with, and this becomes very relevant to what now-Justice Gorsuch was talking about in Renewable Energy, Stern was simply holding that 157C, which provided, of the bankruptcy code, which provided that all counterclaims of the estate against persons filing claims against the estate could be adjudicated on the merits by a bankruptcy court that had core jurisdiction to do that, and the Supreme Court just simply said that that was too broad. I got to get you to respond to the language I'm quoting to you, quote, cases properly in federal court but arising under state law and not necessarily resolvable in the claims allowance process trigger Article 3's protection. And Judge Jordan, what he's referring to is the type of case that they had before them, which was a malpractice case, and he's saying when you have-It doesn't look like he's limiting that. He's saying quite the contrary. He says whatever else you can say, you can say this much, and then he doesn't say the case before me is, he says cases, and then he makes a broad statement, and then he focuses dead-on on the claims allowance process. Well, I think that to the extent that he's making a broad statement, he then goes on to address what is the intertwining that can give rise to a bankruptcy court deciding particular issues, and he says that the intertwining that Stern cares about, this is a quote, intertwining that Stern cares about concerns the law, not the facts. The source of the law generating a claim may inform its categorization as involving a public or private right. Now, I'll say this, Justice Gorsuch, I think, has a different view from the majority of the Supreme Court on public rights. We saw that borne out in oil states, and so I don't-I would be reluctant to read too much into his-into Dicta, in his opinion, when he was sitting as a judge on the Tenth Circuit. Having said that, what you have here is, of course, one set of facts, but two entirely separate sets of law. There's a federal law that is being-federal standards that are being applied by a bankruptcy court in granting non-debtor leases, and the fact that that may impair, the fact that that may, in the words of this Court's decision in Lazy Days, surely impact the state law claim, doesn't make it an adjudication of the state law claim. It doesn't just impact it, it wipes it out. As your-as your opponent quite rightly says, this is not just a, well, it's going to have some effect. They have no claim. It is-it is as a matter of legal fact over for them. Now, it's not decided on the merits, but it doesn't-that nonetheless means it doesn't make it any less the case that they have-they no longer have any claim, right? And-and Judge Jordan, that's exactly what happened in this Court's decisions in both Linear Electric and in Lazy Days, where in Linear Electric, they had a state law lien against third parties, against non-debtors, and when Linear Electric was done, they had no state law lien. Why? Because of the preemptive effect of applying federal law standards, and that is exactly what is- That's true, except for sake of discussion. Okay, that's true, that our Third Circuit precedent allows for-for third-party releases. How do we approach this in a way that doesn't throw open the gates for aggressive debtors and folks who-and lead with debtors to wipe out third-party claims just by saying, hey, it's in the plan. It's in the plan, so it's got to be core, so everything goes. Sure. So where are the guardrails in what you're asking us to do? Yeah, so Judge Jordan, I think there are several sets of guardrails that this Court has-has recognized. Those are substantive guardrails. It doesn't implicate the constitutional issues. Those are substantive guardrails when it comes to the application of non-debtor releases. They are the continental hallmarks. They are the fact that you have to have-to have been able to say that you would have had related to jurisdiction over the claims being released. So this Court's decision in court space- Is this related to-I thought-I thought the Bankruptcy Court here said on the-on its bench ruling that I at least have related to, but in later discussion was taking the tact that this was arising in or arising from jurisdiction. So Judge Jordan, I think you're referring to the Bankruptcy Court's footnote at A314 to 315 in which she notes that she had found that there would be related to jurisdiction. She goes further and says, that is the way that courts have approached this, but asks the question, is that really necessary? And ponders whether it would be or not. Now the District Court, in making its own, what I would submit, independent determination vis-a-vis the releases, does conclude himself that there was related to jurisdiction. And this Court's decision per Judge Becker in court states uses whether or not there would be related to jurisdiction to decide whether or not a confirmed plan would have preclusive effect. And that's what we're really ultimately talking about here, is what are the preclusive effects of the grant of these releases? I'm confused a little bit then, because I thought if you said this is related to jurisdiction, you were acknowledging that you were dealing with something non-core. Well, I think they're two separate issues. I think that the-there's a question of whether or not there's core jurisdiction over the-over plan confirmation and the granting of the non-debtor releases. Then there's the question of, could the Bankruptcy Court have exercised-Judge Shigera, have a seat. Thank you. The-could the Bankruptcy Court have exercised related to jurisdiction over the RICO claim? Now, no such jurisdiction was exercised, because those claims were not adjudicated by the Bankruptcy Court, but she concluded that she could have exercised related to-and that's what core state says. But-but as the plan confirmation, there was no assertion that this was related to jurisdiction. That was core. That was arising in jurisdiction, right? Absolutely, Judge Jordan. And my point, if I may, Judge Shigera, my point was simply that when you look at the analysis in core states about whether or not there can be a preclusive effect, the court recognizes that a court that didn't have authority can still enter an order that will have absolute preclusive effect over other proceedings. But the guardrails that core states puts around that is that that would only be true if the Bankruptcy Court could have exercised related to jurisdiction. And here, there's-there's no dispute. And-and indeed, you have two courts separately finding that the Bankruptcy Court could have exercised related to jurisdiction. I had-you came out of the box saying I have three things to say about-about dealing with the equitable mootness point first. You may have gotten to one, but you definitely didn't get to two and three. Can we hear what those other two are briefly? Well, Judge Shigera, I think we actually have kind of backed into them, but there are three ways that you can deal with it. One is to do exactly what the District Court did, which is to say I need to satisfy myself that the Bankruptcy Court had-had constitutional authority. And once I do that, then I can and should apply equitable mootness. And I think that there's certainly not an abuse of discretion. Now, you don't have to do it in that order as-as Metro Media, the Second Circuit's case, they're recognized. I think as Tribune recognized, you can take them in any order that-that you want. You-you can decide merits that you can then turn to equitable mootness or-or vice versa. The second way you could deal with this is the point that I was making with-with Judge Jordan is I do think that certainly the Bankruptcy-excuse me, the District Court intended to make an alternative holding that was not depend-that was not dependent on the Bankruptcy Court's holding vis-a-vis the-the-the non-debtor releases. I understand there is one reference in his discussion to-to clear error. And so you may feel like that that's not something that you could do, although that's not inconsistent with-with Rule 72a because in some circumstances a report-you can review a report and recommendation for-for clear error. And then my third point was the one that we spent the most of the time on, which is simply this. It's not a jurisdictional issue. You don't have to decide the stern issue because it doesn't implicate Article III jurisdiction or statutory jurisdiction. It is a question of authority just like it would have been if it was a magistrate. And I think in those circumstances, just like the Eleventh Circuit recently applied equitable mootness in the face of what I think was a due process challenge, a case called Bennett v. Jefferson County, 899F3-1240, there's no reason that this Court couldn't apply equitable mootness in the face of an authority challenge. I just had one other really brief question. You mentioned in your argument, this is with respect to the equitable mootness point, you pointed out that your-your adversary, although they pursued a stay of the confirmation order in bankruptcy court, they didn't thereafter. How does that work into our analysis, if at all? Well, I think that there are- Why is that significant? Yeah, I think there are a number of cases that have recognized that the failure to pursue all possible remedies is a factor in deciding equitable mootness. And I think this Court's recent decision in Allied Nevada, for example, made a point to that effect. And so they absolutely could have-could have sought a stay from the district court. Now, they say that that would have been futile. I don't know what-why they're-they're saying that, that it may be a very significant concession. But they could have sought a stay from the district court. They could have sought a stay from this court. And there are other things they could have done, too. For example, they could have objected to plan confirmation on the basis of 1129A7, which would have been to say, well, I'd be better off in a liquidation. I'd be better off if I could go pursue these RICO claims and take the 1 to 5% that I would recover from the company. Now, they didn't do that because they wanted to have the benefits. And now what they want is they want to have the benefits, but without the burdens. And I think, if I may, Judge Chigares, one- Well, you're just about done, my friend. One-one final point on this, and if you look at Appendix 2976, you see that the ad hoc lenders, who are in the exact same shoes as Voya, had-would have had the same putative RICO claims, would have been exactly the same situated. They said the value proposition of settling these claims for a $325 million payment, in many ways, undoes the purported damage done. You take the business and you let it grow so that you can get back what you lost in one transaction or another. That requires that you shield it. And that is exactly why the bankruptcy court at A3599 found that it wasn't just the equity holders, it wasn't just the debtors, but it was the ad hoc group that was insisting on the releases. Why? Not just for the benefit of the equity holders, but so that the debtor could truly obtain a fresh start, because otherwise, the equity holders would have had the claims against the debtor for indemnity, and erasing that was ultimately to the benefit of the lenders who were obtaining equity in the new company. I appreciate your indulgence, Your Honor. Thank you, counsel. Thank you, Your Honor. May it please the Court. I'm going to pick up first on the stay issue. First of all, this Court has never held that a stay, that obtaining a stay or even asking for a stay, is necessary in order to prevent an appeal from being equitably moved. In fact, in Semcrude, the appellant never even sought a stay. There's a very good reason why after asking for a stay from the bankruptcy court, once it was denied, we decided not to pursue what we perceived to be a frivolous appeal. And that is what I alluded to in my opening argument, which is that the government was going to kill this company. If the settlement was not consummated by December 30th, there was no way we would be able to challenge that. So, no, we did not pursue a stay that would have been fruitless. I also would point out that the equity holders had the right, if they wished, not to consummate the plan until all appeals had been exhausted. They chose to waive that right. And the reason they chose to waive that right is because they wanted the settlement to go through. They wanted to get the benefit of the releases from the company where they were facing potentially a $1.8 billion liability. They wanted to get that release and they wanted to get peace with the government. So, they knowingly took the risk. They knew Voya was going to appeal the release issue. How, get past all that and explain to us how this is not equitably moved. How is it possible to tease out your little piece of it and not undermine the benefit of the bargain that everybody else was planning on? So, two responses. So, first of all, for the same reason that the court was able to do it in SEMCRUD, Continental, and PWS, which is... Go ahead. I'm not sure how pointing to completely different factual scenarios tells you that it would work here, but go ahead. Yeah, I'm not sure they're completely different factual scenarios, but the basic idea is you excise from the plan the releases as to Voya. There's nothing inequitable about that because it doesn't require undoing the entire plan. There's nothing in the plan that indicates that the sponsors would be able to get any portion of their contribution back if that was the result. There's nothing inequitable about that. The record is replete with declarations, findings by the bankruptcy court, endorsed by the district court, that this would never have happened. This would never have happened as a reorganization, but for those releases, right? I mean, of all the things you can disagree with, you can't disagree that the record says that, right? The releases broadly construe. Now, of course, 93% of the releases are not at issue here because those lenders consented. You're just talking about a very, very clear assertion on the record that these releases... The very centerpiece, I believe it was. So it would never have happened without them. So how is it consistent with that to say it's okay for you to say, yeah, everybody got released and we wouldn't have gotten anything like this reorganization, but for those releases, but now let us sue them. How do those things work together? I'm out of time, Your Honor. May I answer the question? Please. Because we know that prior to the Chapter 11 proceeding being filed, the equity holders were willing to do exactly that. They were willing, in the context of an important strike. They were willing to do it before, but how does, you know, but we're not back there. We're in time saying, that's a little like saying when they said they wouldn't do it otherwise, they were lying. Well, you can't really get that far with, if they say they wouldn't have done it otherwise because they said they'd do it before, because the facts found by the district court, by the bankruptcy court asserted in the declarations are it never would have happened without the releases. That's the factual foundation we're operating off of. I don't believe, there is a factual finding that the releases, as I said, broadly construed were necessary in order to obtain the funding for the plan. I don't believe there is a specific factual finding because nobody testified about this that had they not been able to obtain a release specifically from VOIA or if VOIA's release had been exercised on appeal, that they wouldn't have, and I actually don't, I'm sorry. The position is, when the court said this is the centerpiece, it could, it wasn't really saying the VOIA releases were essential. It was saying everything but the VOIA releases were essential. Essentially, yeah. And that's the same, that's the same situation in some groups. I got it. Okay. Okay. Thank you, counsel. Thank you, your honor. I appreciate it. We'll take the case under advisement and thank counsel for their excellent briefing and argument and like the other case, we'd like to greet you at sidebar if you're amenable to that.